Case number 16-2181, Hemlock Semiconductor op v. SolarWorld Industries section. Oral argument not to exceed 15 minutes per side. Larry Elliott for the appellant. You may proceed. Good morning. May it please the court, I'm Larry Elliott. I'm with the law firm of Cohen & Grigsby in Pittsburgh. I represent SolarWorld Saxon. I sometimes will refer to it as Deutsche Solar just out of habit, but I'll try to say Saxon. I would like to reserve three minutes for rebuttal. This is an interesting case in that it is a take or pay contract with terms that in the beginning were favorable to both parties. What happened in this market was unprecedented. The Chinese came in, dumped solar panels on the market, which crashed both the solar panel market and the polysilicon market. This contract covered the polysilicon end of the market, which is used to make the solar panels. There were trade cases filed. In those trade cases, the U.S. and the EU found that China was deliberately dumping solar panels on the U.S. and EU market and that it had led to an unprecedented drop in price over the whole market. Many of the people that were in this business went bankrupt. We raised three issues on appeal. The first involves an issue of German law, and that is it's fundamental law that the court cannot put itself in the position of enforcing what is an illegal contract. Built into this contract were the take or pay provisions and also a provision that would not allow Saxon to resell the polysilicon. Under EU and German law, that is referred to as a hard core restriction, and a hard core restriction makes the contract illegal per se. We raised this issue in the EU and Germany. How about in the U.S. of A? In the U.S. of A, the Michigan courts have ruled this way and the federal courts have ruled this way. It doesn't matter if you're creating an illegality in Germany or in the U.S. The courts will not be a party to an antitrust violation, whether it's a foreign law that's involved or whether it's a U.S. law. What is the best case that you would cite for that? Give me one second. If you want to give it to us in your rebuttal. Let me do that. I'll give you four cases. Good. I just don't have them all. The take or pay provision in and of itself is not illegal. Not at all. It would not be illegal under EU law. It would not be illegal under U.S. law. It is the combination. So how do you distinguish this Supreme Court case of Kelly v. Kosuga from 1959 that says, hey, if one part's okay and the other part's not okay, but they're only trying to enforce the okay part, that's all right? That's the way the judge ruled, and that was a mistake. The two are inextricably intertwined and can't be separated. You say that. We had probably the top lawyer judge in Germany submit affidavits on German law, and he submitted an affidavit to the court and included cases from the ‑‑ it's not a court. It's an organization that determines these matters, and it says it is per se illegal and it can't be divided. Is that that B CART A? Yes, yes. It's an administrative ‑‑ Right, it's an antitrust agency. Yes. But they settled a case containing such a combination by simply removing the resale prohibition, didn't they? That was ‑‑ Allowed the take or pay to stand. The parties did that afterwards. Because these courts are there to try to mediate and do that. That couldn't be done in this situation. Why not? Well, because what happens is as soon as this contract was accelerated and terminated, the harm under the German law was automatically done. Because the product was withheld from the market, the pricing by Hemlock was protected, and the competition that would have been if this product could have been taken and resold could never happen. And that's the harm under the EU and German law. That's what they're seeking to prohibit. So the contract is accelerated, meaning your client has to pay the full amount. Yes. But you didn't get the product? Let me back up and give you a little bit of fact. We took the product as long as we possibly could. When the price got to the point ‑‑ first of all, we couldn't sell our solar panels because we couldn't cover our indirect costs. The market was so ‑‑ But the thrust of my question, which is perhaps not a good one, is if you could have taken the product and stored it somewhere, and then later when the market for solar panels changed, then that would be fine. Now, if it were tomatoes, of course, tomatoes would rot and that would not be any good. But is this a product that you could have taken and stored under the contract as it was interpreted? We did that as long as we could. But why couldn't you do it for the whole ‑‑ We would have been in a position ‑‑ it would have bankrupted us, frankly. But you had to pay anyway. Well, we couldn't ‑‑ at some point we couldn't pay either. How much did the market drop from the contract price? About ‑‑ initially it dropped, I think, 60%. It was dramatic. It's since dropped more. There's, again, another trade case recently filed because the Chinese have continued to dump on the market. Let me ask you this. Let's say that the Chinese did exactly what they did, but instead of illegally dumping, they just came up with a more efficient process of producing polysilicon. Would you be here with the same claim of impracticability? On the impracticability, which was our second argument, we would not be here on the same claim. If the Chinese had come into the U.S. market and competed fairly, that is not impracticability. Okay. So your impracticability is based solely on the fact that what they did was illegal. It was illegal. In other words, they were selling solar panels that were being ‑‑ the Chinese government was basically propping them up so they could sell them at a price, and they deliberately targeted the U.S. market to take over the U.S. market. Okay. All right. So if that's your theory, what's your case that supports that, that the market dropped due to the illegality of a third party that let you out of the contract? Well, the only case we found that is like this is the case out in Oregon, which was the Chang case. And in the Chang case, the intentional manipulation of the market by Enron was found to be to frustrate the purpose of the contract. Yeah, but the Chang case is really distinguishable. The Chang case, as I recall, it was an index used to determine the price of electricity, and that was being manipulated. Well, but the whole idea of the contract was to base it on the fair market value of that index, and the parties were manipulating the index. That's a little different. Well, here you had agreed you wanted a fixed price for this polysilicon. That was the whole idea of the contract. But we wanted a fixed price in a functioning market. Both parties, you know. But couldn't you have put that in the contract, that the fixed price pertains only as long as, and then put in various conditions? I guess in hindsight, you could put anything into a contract. And I can tell you, my firm didn't advise them on signing this contract. So the U is a generic U. But in general, that's the response to anybody in a contract dispute. We read the contract, we apply the contract, and it's sad that things happen later on. But you're saying illegality is a separate matter. But I still get back to the question, why under the contract terms you couldn't have paid the penalty, the liquidated damages, and received the product? And that's a big if. Maybe the liquidated damages didn't allow you to get the product? I don't know. Well, at this point, we could have done that, but a lot of things happened. Remember, this contract contemplated, and we paid $180 million up front, so that Hemlock could build its new facility in Tennessee and upgrade its facility in Michigan. That did not happen. Again, because of these market conditions, it never happened. And they retained our $180 million. For the first five years or so of this contract, you all did fine, because you were buying it for less than the contract. I mean, the contract price was less than the market price. And this is what the parties contemplated. Can I interrupt just for a minute? Yes, of course. I didn't follow why the facilities didn't get built, because there was no demand? At this point, they also couldn't produce polysilicon at a price that made any sense. And so it was cheaper for them to not build out the facility and keep the money. In fact, they were going to – The contract didn't require building with that money. It did not, but it was contemplated by the parties, and they were told that's what the money was being used for. I understand that part, but there's no – the fact that you're out the money, it's not compensable here under the contract because of some violation, breach. No, no breach. Getting back to Judge Moore's question, I guess it sort of puzzles me, too. You've got these two big sophisticated commercial companies. They're signing a 15-year supply contract for a high-tech thing, and nobody builds in that, hey, the market could plunge, could rise for all sorts of reasons, and why couldn't they just have put a – hey, if the market price varies from the contract price more than 20 percent, then we'll renegotiate. Why is that such a term? The problem, Your Honor, was that polysilicon was in such low supply at the beginning of this period that companies were desperate to get polysilicon. MLOC provided these companies with a solution. Their expert says that your client benefited over $500 million in the early years by getting it for less than the spot price. Well, they also made a profit in those years, too, and they also were getting free financing for the work they were doing in Tennessee. So it's not a one-sided thing here. They got a lot of money. As a matter of fact – and I'll sum up real quick. As a matter of fact, they made a conscious decision. They were negotiating with all their buyers and trying to come up with some way to work this out, and at some point they made the decision that they were going to be in the business of suing people because they would make more money by enforcing this contract than they would by renegotiating the contract. I see my time is up. Your rebuttal time. I didn't get to my third argument, but it's in the brief. Thank you. Good morning. May it please the Court. John Ansborough with Oreck Harrington representing Hemlock Semiconductor Operations. Judge Gilman, you've got this correct spot on. This is not a hard case. I want to start just by clearing up the record here. The expansion happened. My client, Hemlock, spent $2.2 billion on a plant in Tennessee. State of the art. These are capital-intensive, high-tech facilities that are requiring expertise. Using their money? I was asking whether the funds that were paid for that purpose. Yes, so the way the contract works is all of the customers made advance payments. They earned back those advance payments with each purchase, and so actually it's an advance pay that they earn back. If the customer completes the 10-year supply period, it has earned back all of those advance payments. Conversely, they're a form of revenue for us. We spent $1 billion building out Michigan and $2.2 billion building out Tennessee. All of that was a loss. When customers like Soxen and others defaulted on their contracts, Hemlock was forced to close Tennessee. It was ready to go. We had to take a $2.2 billion loss and lay off 400 people in Tennessee. The suggestion that that expansion never happened is simply false. Ben, your point is in the record? Yes, it is, and the district court correctly recognized that. Let me just sort of tick through. It's important for the court to understand where we are in this case. The record is clear, and the district court recognized it. In 2005, this customer and others beat down the door, begging Hemlock to expand its facilities to supply solar polysilicon. Hemlock was hesitant to do that. It had had bad experiences before, and they worked out a structure where the allocation of market risk would be shared fairly, and so in exchange for advance payments, Hemlock agreed to supply for 10 years. Our contract price with this customer for those 10 years started at around $50 and dropped down slowly to the extent, I think the end mark was supposed to be around $44. But the point is, to Judge Gilman's point, that market price reached $400 three, four years into this thing. You are correct. It is unrebutted that Soxen reaped $510 million of cost savings. When the Chinese allegedly flooded this market, allegedly and fairly, the market did start to drop. Can you debate that, whether they did it or not? No. There is a global oversupply, correct. I'm not here to opine whether it was legal or illegal. It is correct that there is a trade war, and there's been anti-dumping duties applied by both sides, by both countries. What about the argument that your opponent raises that part of the contract was illegal? Okay. We'll get to that. Again, you're exactly correct. A couple of things we need to square away. We are here enforcing only the liquidated take or pay damage clause. The bar to resale has nothing to do with this case. They never asked to resell a product. It's never been a part of the record. It has absolutely nothing to do with this. Did they make a claim about this at all? No. In terms of any of the pleadings in the case or briefs in the case? Never. All there is is a generic reference to violations of EU antitrust law. Under Kasuga and the Kaiser. That's something, isn't it? Isn't that a claim? It's an affirmative defense. Okay. Yeah, which is why we're here now talking about it. But it was never parsed out specifically in the pleadings or anything. But I'm happy to talk about it now. It's the basis of their opposition here. Under the Kelly v. Kasuga and the Kaiser Steel line of cases, the United States Supreme Court has made clear that where the clause being sued upon does not offend antitrust, then that clause will go forward and an antitrust affirmative defense cannot happen. Antitrust affirmative defenses raised in bread and butter breach of contract cases like this are disfavored by the United States Supreme Court. In this case, the only thing being sued upon, the only piece of this contract being enforced is the accelerated take or pay clause. Kelly says they're inextricably intertwined. They're not inextricably intertwined for the following reason. Well, they can say that, but what Judge Ludington is required to do under the Supreme Court precedent is look and satisfy himself, are they inextricably intertwined? And here he correctly concluded they are not. They have nothing to do with one another. And the court explained in great detail why that is so. So the anti-resale provision could be excised from the contract. Is that the theory? It could be. It's not at issue in this case. But let me address something else that counsel said. In the German regulatory cases, which, by the way, are by definition preliminary, they were settled out, the two of those clauses together are not the hardcore restriction. As Judge Ludington correctly read those cases, he said, wait a minute, apparently under the EU that regulator thought that the bar to resale, that could, under certain circumstances, be a hardcore restriction. And so, but the key piece being there, could. And the regulator in those cases go on to talk about market conditions that would have to align in such a way that those two provisions working together with the offending bar to resale could be a hardcore restriction. Sorry, just with the hardcore restriction out. But, Judge Gilman, you've got it correct. So what ended up happening there? The parties reached a settlement. Both of the companies that had the bar to resale said, fine, if that piece of this falls away under EU law, is there any problem there? The regulator said, no, that's fine. Take your take or pay and go off. And that's how it ended, and the take or pay continued in full force. How did this work in terms of the liquidated damages of a very large amount need to be paid under your theory by your opponent? What do they get? Do they get the product? No. Here's how this works. And the large amount, it's just the amount, it's the full-term commitment that they made to either take or pay for the product. Here's how this works. There's a suggestion here that they were wanting to take product, but they just couldn't take it. That is not what happened here. When the market began to approach the contract price, we got a letter from Soxen that said, by the way, you need to lower our price. Because if you don't, the moment that the market price hits the contract price, these contracts are not worth the paper they're printed on. That's a quote that is cited by the court, and it's in our briefs. That's the notice we got after five years. They've made their $500 million of cost savings. There's five years left to go on the contract. We get a letter that says, by the way, we're going to be done the moment this thing turns south. That is what they did. Shortly thereafter, we negotiated a couple of amendments. We dropped prices for interim periods of time, and then they just stopped purchasing. This is not a situation where there's, you know, an honest effort by the customer to try to work this through. We got a note that said, we're out of here. It's a deliberate breach. Did they ever ask for product to be given to them in exchange for their making the liquidated damages payment? No. No, there was no such request. This is a deliberate breach. There's no defense to liability here. Well, there's a certain appearance of unfairness in forcing the other company to make a liquidated damages payment equal to the quantity times the price of the contract without giving them the product that they are theoretically paying for. Well, so you're asking about, is a take-or-pay provision fully enforceable? We cite it is fully enforceable. Well, it could be fully enforceable if they pay for and get the amount that they are supposed to have been paying for. Right. Yeah, but Judge Moore, that's not this contract. That's not the Michigan law. I mean, that's a hypothetical world. So this contract, there's a provision that either says or implies that they do not get the product. The take part of the take-or-pay. This is clear as a bell. Where would you have me look? It's in Section 5. Section 5, okay. I know it's cited in our brief, Judge. I'm happy to take it out. And you say Michigan law is clear. Is there a case that you'd have me look at? A whole host of cases that Judge Ludington relied on off the top of my head. But let's get, so I think, Judge Moore, where you're going with your question is, is this a penalty or is this not a penalty? That is their argument here. Judge Ludington correctly found it is not. The analysis of whether a liquidated damage clause is a penalty focuses at the time of contracting, not later in time. You don't look at the time of the breach. It asks the question, was it, you know, uncertain enough, the potential damage to Hemlock in this situation, so that when the parties agreed, and by the way, sophisticated parties, in four contracts, four separate times in four separate years, agreed to this term. The question is, was it reasonable? And Judge Ludington correctly found it was reasonable if you look at it this way. Hemlock is making — It seems to me that you could say that it is not reasonable. If the take-or-pay provision involves hundreds of millions of dollars each year and no product is given in return. That just seems totally unreasonable. You could say that. But if there are cases that are binding on us and that hold that clearly, and we're applying Michigan law, right? So we just look at Michigan cases, right? And they could have — Saxon could have taken the product, couldn't they? I mean, if they were paying for it, they could have taken it. If this customer — and just to be clear, we have a number of customers that, through today, continue to perform under substantially identical contracts. We're here because this customer decided that when it didn't like the price anymore, it tore the contracts up and threw them at us. That happened with five years left to go. But to your question, Judge Moore, is this fair or is it not fair? It's not really — that's not phrasing the question. The question is whether, at the time of contracting, it was reasonable, and here's why Judge Ludington found that it was. Hemlock, at that time, is committed to making billions of dollars investment, hiring hundreds of people, all of the infrastructure that goes with that. Hemlock takes on a huge production risk. We had to be able to supply this high-tech product for 10 years. The buyer assumes the market risk. What my damages were were uncertain at the time because of all of the factors that go into this. Judge Ludington explains why they argue that lost profits ought to be the measure of damages here. Lost profits, Judge Ludington correctly recognized, in a take-or-pay context, don't fully address, at the time this deal is struck, what the potential damages were. And lo and behold, we have a situation, as I've described to you, where my client has written off more than $2.2 billion of losses in the state of Tennessee, laid off 400 people. That's the kind of sort of unassertainable, with any specificity, damage that can occur down the road, which is exactly the allocation of risk that is contemplated by this man. I noted you talk about 10 years. Under these LTAs, they were extended for five more. I mean, wasn't it from 2005 to 2019? Well, so in order to build out the plant, Your Honor, I don't recall the specific time frames here, but so, for example, the first one of these agreements is signed in 2005. There's a year, sometimes two-year lead time because it's so capital-intensive. These are very high-tech facilities. So we're building in those first years of the contract, and then the supply period is for 10 years. Your Honor mentioned it's 15 years. It's actually not. It's a 10-year supply period. I remember the year 2019 was mentioned. 2019 would have been the last year had they stayed with the program. That's correct. Does the record show whether or not your opponent actually asked for the production of the product in exchange for the payments of the loan? No, because it never happened. The record does not show that they asked. Is that your answer then? Or the record shows that they did not ask? No, the record shows that they came to us and demanded a unilateral price drop. And then the record shows that when they weren't satisfied with that, they sent us a note that said, guess what? We're done. We're tearing your contracts up. The record will show you that these affirmative defenses that we're looking at here, these are the scraps. The thrust of this whole litigation were premised on other defenses. Their CEO testified that we had amended the contract orally. We had amended it by our performance. We had a standstill agreement in place. We had agreed to different quantities. Judge Ludington parsed this record very carefully and said, but wait a minute. Those bits of testimony are contradicted by documents that come out of your file and by statements made by your other senior executives. That's the gist of this whole case. We're now down to a situation where the Supreme Court has said this is a classic example. This is straightforward breach of contract case. Michigan law requires this panel to apply the contract as written, and the Supreme Court says, when you've got this situation, we're not going to hear about antitrust defenses, much less European antitrust defenses. There is no case where EU antitrust law as an affirmative defense has been asserted. It would be unprecedented to do so here. You're actually unable to do so here precisely because the provision that's being sued upon has nothing to do with the bar to resale. The cases that they're showing you from the EU, they're no different. The bar to resale, okay, they called that a hardcore restriction. That was jettisoned, and everyone went on their merry way. Those illustrate and support, and Judge Ludington explained in his opinion, exactly why actually those cases support us. There's an argument. Let me just finish on this point. You have a red light on, so if you want to say one sentence, that's fine. There's nothing in the United States Supreme Court precedent that says that the analysis under Kasuga and Kaiser Steel is different if the defendant is asserting foreign law. You cannot do that. The Supreme Court precedent here requires an examination of whether or not the clause sued upon offends antitrust violations. This one, admittedly, does not. Now there's a paragraph that you've said, so thank you very much. Thank you. A couple of points. First, the administrative actions are being misrepresented here. There is no calculation involved in it. I'll invite the court to read those. It is an absolutely prohibited restriction. It is a hardcore restriction. The panel went on to explain with some calculations how it affects. It's true, isn't it, that that provision is not the one that we are here to. I mean, you have two provisions of the contract, but they're suing you on the contract side of it, not the restrictive side. Your Honor, they want to say they're only suing us on a contract, but they're asking the court to become involved in doing something that would be illegal under EU law. The administrative cases are absolutely clear on that. The affidavit we submitted from the expert is absolutely clear on that. Second, they're not just asking you to award damages. There was an acceleration clause that they came under. There was a termination clause. All of this, you know, negotiations were ongoing, and they asked us to give assurances of payment, which we couldn't do. We tried. They then accelerated the contract and canceled it. That's what they did, because at that point, they decided it was more profitable to them to sue on the contract, and that brings up the penalty issue. These damages are all out of proportion to what they actually incurred. What did Judge Livington say with respect to that argument? He did consider it. You offered that, didn't you? Yes, and what he did, we submitted hidden in sort of their expert report. I'm sorry, I'm getting really near the end here. Hidden in their expert report was another expert report that they had. . . But all of this is before Judge Ludding. Yes. I don't know where to get my answer. Yes, and then he. . . My question is really, he answered it. He ignored that because he said, we should have presented an alternate damage calculation. I see. I'm not sure why that would be our burden. He's probably wrong on that, I think. I agree with you 100%. Let me see. As far as this impracticability, I'll sum up really quickly. This is very, very unprecedented what happened. If there was ever a case where there was something that. . . If you look at the restatement of contracts, they talk about extraordinary things that might affect the market. This is a case where the jury should have been allowed to decide, were these facts that we presented, did they fall into that extraordinary category? I don't think that's a jury question. That would be sort of a question of law, I would think. Do you think? I'm sorry, my time's up, but I'll say one sentence. It seems to me that whether something is anticipated, whether it is a reasonable expectation of the parties, that would be a jury question. Thank you. I just wondered if the parties are opposed or willing to. . . Are all those. . . Is that out of the question anymore? Judge, we've been litigating for five years. I know. There's probably too much bad blood, huh? Well, this is not a matter of bad blood. This is a straightforward contract case. Okay. I'm very tempted to respond in substance, but I'm not going to do that. No, Judge Cook just asked if this was a case. . . There are not discussions right now. Okay. Thank you. Thank you both for your argument. The case will be submitted.